UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FIROOZ ZAHEDI,<br><br>    Plaintiff,<br><br>    v.<br><br>MIRAMAX, LLC, et al.,<br><br>    Defendant. | Case No. 2:20-cv-04512-MCS-E<br><br>**ORDER RE: MOTIONS FOR SUMMARY JUDGMENT (ECF NOS. 145–46)** |

Plaintiff Firooz Zahedi and Defendant Miramax, LLC, both move for partial summary judgment. (PMSJ, ECF No. 146; DMSJ, ECF No. 145.) Both motions are fully briefed. (PMSJ Opp'n, ECF No. 170; PMSJ Reply, ECF No. 177; DMSJ Opp'n, ECF No. 162; DMSJ Reply, ECF No. 173.) The judge who previously presided over this case entered an order resolving the motions, and the undersigned judicial officer vacated that order. The Court deems the motions appropriate for decision without oral argument. Fed. R. Civ. P. 78(b); C.D. Cal. R. 7-15.

1

I. **REQUESTS FOR JUDICIAL NOTICE AND EVIDENTIARY OBJECTIONS**

Zahedi requests judicial notice of screenshots from Miramax's website, two copyright registrations, and corporate records of Miramax on file with the New York Secretary of State. (Reqs. for Judicial Notice, ECF Nos. 146-6, 169, 177-4.) The Court takes judicial notice of the copyright registrations, which are public records not subject to reasonable dispute. Fed. R. Evid. 201(b); *see Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006) ("We may take judicial notice of court filings and other matters of public record."). Because the Court need not rely on the other documents requested to be noticed to resolve the motions, the Court denies the remaining requests as moot.

The parties submitted voluminous evidentiary objections, many of which need not be addressed to resolve the motions. To the extent this Order rests upon evidence subject to objections, the objections are overruled unless otherwise stated.

II. **BACKGROUND**

In 1994, Zahedi, a photographer, took several photographs of Uma Thurman in character in her now-famous role as Mia Wallace in the Quentin Tarantino film *Pulp Fiction*. (PSUF ¶¶ 12–13, ECF No. 146-1.) Miramax,[1] the studio that produced *Pulp Fiction*, used one of Zahedi's photographs with some changes (including the position of the gun on the bed in front of Ms. Thurman) on its poster for the film. The poster was used to promote the film at the Cannes Film Festival in 1994, as well as for the film's theatrical release later that year. (DSUF ¶ 59, ECF No. 145-1.) Zahedi describes the image as "iconic." (FAC 3, ECF No. 27.)

///

---

[1] Zahedi distinguishes between Miramax Film Corp. and Defendant Miramax, LLC to emphasize that the latter Miramax was not the corporate entity that produced *Pulp Fiction* or paid him for his photograph. The Court addresses Zahedi's argument *infra*, but refers to the entities collectively as Miramax except where noted.

At the time of the photo shoot, Miramax paid Zahedi $10,000, although exactly what Miramax was paying for is the subject of these motions. (PSUF ¶ 5.) Neither party has produced a signed agreement identifying what rights either party retained in the photograph. Miramax obtained a copyright registration for the poster as a "KEY ART TRANSPARENCY" from the Register of Copyrights in 2003. (DSUF ¶ 3.) On Miramax's copyright registration, Miramax checked the box to register a "2 Dimensional artwork," not a photograph, and does not identify Zahedi as a contributor at all. (Fried Decl. Ex. C, ECF No. 145-5.) Zahedi obtained a copyright registration for his photograph in 2019. (PSUF ¶ 36.) Zahedi's copyright registration states the title of the work is "Poster for Pulp Fiction" and identifies the work as a photograph. (Zahedi Decl. Ex. 6, ECF No. 146-6.)

### A. The Creation of the Photograph

The above facts are undisputed, but the parties offer irreconcilable stories regarding how the photograph was created.

#### 1. Miramax's Story

According to Miramax, Miramax developed the concept for the image and hired Zahedi to execute its vision, buying out all the rights. Tod Tarhan, a former Miramax art director who worked on the campaign for *Pulp Fiction* in 1994, described the process by which he and the rest of the Miramax team developed the concept for the Zahedi shoot. (Tarhan Dep. 14:18–16:3, ECF No. 145-10.) He and colleagues developed the idea of depicting Uma Thurman as a "femme fatale," including deciding on Ms. Thurman's pose. (*Id.*; *see also* Lubell Dep. 24:3–13, ECF No. 145-14.) Tarhan says he developed sketches for the poster in late 1993 or early 1994. (Tarhan Dep. 52:9–19.) The sketches are very similar to the image used in the *Pulp Fiction* poster: they depict Ms. Thurman lying on a bed in the pose used in the photograph, holding a book, with a gun lying on the bed in front of her. (*See* Fried Decl. Ex. I, ECF No. 145-11.) Pamela Lubell, who was at the time the director of creative services at Miramax, says the concept sketches were reviewed by Miramax executive Harvey Weinstein before the

photoshoot. (Lubell Dep. 31:11–32:21, 34:2–35:4.) Lubell also testified that Zahedi was selected to execute the concept "because he . . . was very talented and we knew he could follow the layout and do the job." (*Id*. at 62:21–24.) Miramax paid the expenses for the photoshoot. (DSUF ¶ 45.)

Miramax witnesses testified that Miramax would not have hired Zahedi without a work-for-hire agreement. (*See* Lubell Dep. 42:4–6, 43:3–14; Hochman Decl. ¶ 2, ECF No. 145-22.) Miramax has diligently searched for the agreement. (*See generally* Hochman Decl.)[2] However, many Miramax files are difficult to search because they were contaminated by debris from the September 11, 2001 attacks on the World Trade Center, which were near Miramax's offices in lower Manhattan. (Hochman Decl. ¶¶ 5, 16.) The documents have been in boxes since 2001 and were shipped across the country after Miramax's New York offices closed in 2010 without a detailed inventory being performed. (*Id*. ¶ 6.) The files' organization has been further disrupted by subsequent sales of the company. (*Id*. ¶ 7.) Miramax has not found a work-for-hire agreement. (*Id*. ¶ 20.)

### 2. Zahedi's Story

Zahedi submits that he took a low fee to work on an interesting shoot for a hotly anticipated indie film project, and he created an iconic and beloved image. Zahedi's agent, Janet Botaish, was approached by Miramax for a photo shoot relating to *Pulp Fiction* in 1994. (Botaish Decl. ¶ 3, ECF No. 146-2; Botaish Dep. 66:13–20, ECF No. 170-14.) Miramax had a limited budget and offered Zahedi $10,000, below Zahedi's standard fee, but Zahedi accepted because he was interested in the project. (*See* Botaish Decl. ¶¶ 7–8; Zahedi Decl. ¶¶ 7–8, ECF No. 146-4; Botaish Dep. 103:8–22, ECF No. 177-7.)[3] Inspired by actual pulp fiction, Zahedi set up the shoot in his studio, hired a

---

[2] Zahedi objects to Hochman's declaration for lack of foundation and lack of personal knowledge. Hochman is Miramax's designated Rule 30(b)(6) witness and testifies to her personal knowledge of the search for the documents. Her declaration is admissible.
[3] Miramax offers conflicting testimony from Botaish, who states she does not recall

4

props director, selected Ms. Thurman's shoes, and shot a series of photographs. (Zahedi Decl. ¶¶ 13–21.) The parties did not execute a work-for-hire agreement or other "buyout" agreement. (Botaish Decl. ¶¶ 11, 13; Zahedi Decl. ¶ 11.) The parties did not execute a work-for-hire agreement because Miramax "didn't do contracts." (Lubell Dep. 45:12–20, ECF No. 162-23.) Zahedi orally licensed to Miramax the right to use the photograph on a physical poster to promote the movie, but he did not otherwise grant Miramax a license to use the photograph. (Zahedi Decl. ¶¶ 10, 12.) When the poster won a "Key Art" award from *Hollywood Reporter* in 1994, Zahedi was credited as the photographer. (PSUF ¶ 28.) Zahedi used the photograph he took of Ms. Thurman for the back cover of a book of his photographs, and he has sold prints of the photograph through galleries. (Zahedi Decl. ¶ 25.)

### B. Uses Since 1994

Miramax has used the poster widely since *Pulp Fiction*'s release in 1994. Beginning in 1995, the poster appeared on the sleeve of VHS tapes that were available at Blockbuster and other stores. (DSUF ¶ 8.) Beginning in 1996, the poster was used on the sleeve of LaserDiscs. (*Id.* ¶ 9.) Miramax says it always attached a copyright notice identifying Miramax as the copyright holder. (*See id.* ¶ 6.) A 1994 script for the film published by Miramax Books, however, identifies the cover photograph (Zahedi's photograph) as copyright Firooz Zahedi. (Trechsel Decl. Ex. 38, ECF No. 171-2.)[4]

---

Zahedi's range of fees. Neither deposition excerpt includes sufficient context to understand why the testimony is in conflict. The Court credits the testimony offered by Zahedi here.

[4] Miramax points out that the book (the *Pulp Fiction* script) was written by Quentin Tarantino, and it objects to Zahedi's use of the book as evidence on the grounds that it is hearsay, it has not been properly authenticated, and it is irrelevant. Miramax is wrong on all three counts. First, Zahedi's attorney, Frank Trechsel, explains where he obtained the book: he purchased it on Amazon.com. It is therefore properly authenticated as evidence. It is also not hearsay: the statement that it is "copyright Firooz Zahedi" is not offered—or at least is not taken—to prove Zahedi owns the copyright, it is offered to prove that *Miramax* itself attributed the photograph to Zahedi. Finally, the book is

The image has also appeared on T-shirts, socks, and other merchandise. (*See* FAC Ex. B, ECF No. 27.) In 2015, Zahedi received a Mia Wallace action figure as a gift. The packaging for the action figure prominently featured the poster. (DSUF ¶ 10.) The action figure also had a Miramax copyright mark. (*Id.* ¶ 11.) Zahedi's stepson posted a photograph of Zahedi holding the action figure on Instagram, with the caption "Happy Birthday to my Stepdad @fitzphoto [emoji] Turns out he didn't get toy royalties for his famous photo of Uma™ . . . But at least he has the toy now . . ." (Fried Decl. Ex. F, ECF No. 145-8.)[5] Zahedi commented "Thanks @carltondewoody. Sometimes it's best to settle for the little things in life." (*Id.*) Zahedi does not dispute that he believed the use of his photograph on the action figure infringed his rights. (DSUF ¶ 18.) In 2019, Zahedi received another gift featuring his photograph, this time a pair of socks. (PSUF ¶ 33.) It was this gift that caused Zahedi to file his registration of copyright, to contact Miramax, and eventually to file this lawsuit.

Miramax's Registration of Copyright names "MIRAMAX FILM CORP" as the author of the poster. (Fried Decl. Ex. C, ECF No. 145-5.) Miramax Film Corp. has undergone a series of corporate mergers and sales since 1994. In 1994, Miramax Film Company was owned by the Walt Disney Company. (Suppl. Hochman Decl. ¶ 2, ECF No. 170-26.)[6] In April 2010, "most" of the Miramax Film Company film library was

---

relevant. Although its author is Quentin Tarantino, the book bears a "Miramax Books" logo, as well as a Hyperion logo, indicating that Miramax published the book. Miramax does not assert that the book improperly bears the Miramax logo.

[5] Zahedi objects that this statement by his stepson is inadmissible hearsay. Miramax argues that it is subject to an exception under Federal Rule of Evidence 804. Rule 804 does not apply here—that rule creates exceptions from the rule against hearsay when the declarant is unavailable, and neither party has indicated that Zahedi's stepson is unavailable. Miramax's evidence is admissible, however, because it is not hearsay. The caption is offered to show that Zahedi was aware of the use of his photograph on the toy and that he—or at the very least, his stepson—believed Zahedi should be receiving royalties for its use. The statement is admissible.

[6] The Court addresses Zahedi's objections to Miramax's chain-of-title evidence *infra*.

merged into a Miramax Film Company subsidiary, Miramax Film NY, LLC, with Miramax Film NY, LLC as the surviving entity. (*Id.* ¶ 3; *see also id.* Ex. U, ECF No. 170-27 (Certificate of Merger filed with New York State Department of State).) In December 2010, Disney sold Miramax Film NY, LLC—the successor to Miramax Film Company—to Filmyard Holdings, LLC. (*Id.* ¶ 4.) In December 2011, Miramax Film NY, LLC, transferred all of its copyrights relating to a number of films, including *Pulp Fiction*, to Miramax, LLC, a Delaware limited liability company. (*Id.* ¶ 6; *see also id.* Ex. V, ECF No. 170-28 (short form transfer agreement).) Miramax, LLC is owned by beIN Media Group and ViacomCBS. (PSUF ¶ 31.)

### C. Procedural History

Zahedi filed his Complaint on May 19, 2020 and filed the operative First Amended Complaint on July 21, 2020. Zahedi asserts claims for copyright infringement and vicarious or contributory copyright infringement against Miramax and 26 other defendants, 12 of which have been dismissed. (*See* ECF Nos. 85, 96, 118.) Miramax asserts counterclaims against Zahedi for copyright infringement and declaratory relief. (Answer & Countercl., ECF No. 113.) The Court granted in part Miramax's motion to bifurcate the action into an ownership/timeliness phase and a liability/damages phase and stayed discovery relating to damages until issues concerning ownership and the statute of limitations could be resolved or clarified through dispositive motions. (Bifurcation Order, ECF No. 140.)

## III. LEGAL STANDARD

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). A fact is material when, under the governing law, the resolution of that fact might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The burden of establishing the absence of a genuine issue of material fact lies with

the moving party, *see Celotex*, 477 U.S. at 322–23, and the court must view the facts and draw reasonable inferences in the light most favorable to the nonmoving party, *Scott v. Harris*, 550 U.S. 372, 378 (2007). To meet its burden, "[t]he moving party may produce evidence negating an essential element of the nonmoving party's case, or, after suitable discovery, the moving party may show that the nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1106 (9th Cir. 2000). Once the moving party satisfies its burden, the nonmoving party cannot simply rest on the pleadings or argue that any disagreement or "metaphysical doubt" about a material issue of fact precludes summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). There is no genuine issue for trial where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party. *Id.* at 587.

## IV. DISCUSSION

Miramax moves for summary judgment as to Zahedi's entire First Amended Complaint. Miramax argues that Zahedi's claims are barred by the statute of limitations or, in the alternative, by the equitable doctrines of estoppel and laches, and that in any event Miramax, not Zahedi, owns the photograph because Zahedi was a work for hire. Zahedi moves for summary judgment as to his ownership of the photograph and Miramax's statute of limitations defense.

### A. Chain-of-Title Issue

Zahedi argues that Miramax has not adduced sufficient evidence that it properly transferred any rights it possessed in Zahedi's photograph when it undertook a series of corporate mergers and transfers between 1994 and the present day. (PMSJ 17–19; DMSJ Opp'n 9–11.) Miramax submitted evidence regarding its chain of title in support of its opposition to Zahedi's motion. (*See* Suppl. Hochman Decl. ¶¶ 2–6, ECF No. 170-26.)

///

Zahedi asserts that Miramax did not produce this evidence, which consists of a short declaration from Miramax's Federal Rule of Civil Procedure 30(b)(6) witness, Cindy Hochman, and several exhibits attached to Hochman's declaration documenting the mergers and transfers Miramax has undergone since 1993, during discovery. Zahedi argues that the Court should therefore exclude it. (*See* Evid. Objs. 2–11, ECF No. 177-3.) Zahedi also argues that Miramax bore the burden of proof of demonstrating chain of title both with respect to its defense and with respect to its affirmative claims. (*Id.* at 4.)

Rule 37(c)(1) provides that a party who fails to produce information or identify a witness during discovery "is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." The rule also provides for other appropriate sanctions.

Zahedi offers no support for his assertion that Miramax bore the burden to produce chain-of-title evidence in support of its *defense*. Despite his sweeping claims that Miramax denied the existence of this evidence throughout the discovery period, Zahedi does not show that he asked Miramax for this information and that Miramax failed to produce it. Zahedi deposed Hochman and does not indicate that his counsel even asked Hochman about Miramax's chain of title. Likewise, Zahedi argues that Miramax failed to disclose the chain of title evidence in response to interrogatories, yet he points to no interrogatory specifically requesting chain of title information. The same is true for Zahedi's other discovery requests: they appear to be general requests for information regarding licenses and sublicenses of Zahedi's photograph, which in the context of this case Miramax could (and apparently did) reasonably read as requests regarding *sub*licenses. Nor does Zahedi's First Amended Complaint put Miramax on notice that its position as a successor to Miramax Film Corp. is at issue in Zahedi's case. Without some showing that Zahedi actually asked for Miramax's chain of title documentation, the Court finds that Miramax's failure to produce this evidence in support of its defense was substantially justified and will not impose the discovery sanction of preventing Miramax from using this evidence to support its defense.

1    Miramax's failure to produce this information in support of its *own* case, on the
2    other hand, is a different matter. In its Answer, Miramax asserts a counterclaim against
3    Zahedi for infringing its copyright in the photograph by publishing it in his book and
4    displaying it at galleries. Ownership is an essential element of a copyright claim. *See*
5    *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991) ("To establish
6    infringement, two elements must be proven: (1) ownership of a valid copyright, and
7    (2) copying of constituent elements of the work that are original."). The plaintiff in a
8    copyright infringement case bears the burden of proving ownership, including
9    establishing a chain of title if the author identified on the copyright registration is not
10   the entity exploiting the rights. *BMG Rts. Mgmt. (US) LLC v. Glob. Eagle Ent. Inc.*, No.
11   2:18-CV-03723-VAP-JEMx, 2019 WL 6315533, at *4 (C.D. Cal. Sept. 9, 2019) (citing
12   *Fleischer Studios, Inc. v. A.V.E.L.A., Inc.*, 654 F.3d 958, 963 (9th Cir. 2011)). Miramax
13   apparently did not produce information critical to its infringement claim during
14   discovery. Miramax has not explained why its failure was substantially justified or
15   harmless, and it has not responded to Zahedi's Rule 37(c) argument. Miramax cannot
16   now rely on this information in support of its infringement claim. The Court therefore
17   sustains Zahedi's objection to Miramax's use of evidence of its chain of title to the
18   extent Miramax offers that evidence in support of its motion for summary judgment on
19   the infringement claims.

20   **B.    Statute of Limitations**

21   A civil action for copyright infringement must be brought "within three years
22   after the claim accrued." 17 U.S.C. § 507(b). Generally, this means that a plaintiff
23   cannot recover for damages that occurred more than three years before a suit is filed.
24   *Starz Ent., LLC v. MGM Domestic Television Distrib., LLC*, 510 F. Supp. 3d 878, 883
25   (C.D. Cal. 2021) (citing *Roley v. New World Pictures, Ltd.*, 19 F.3d 479, 481 (9th Cir.
26   1994)). There is an exception if a plaintiff lacked knowledge of the infringement prior
27   to the three-year period preceding filing suit, and if that lack of knowledge was
28   reasonable. *Id.* at 886 (citing *Polar Bear Prods., Inc. v. Timex Corp.*, 384 F.3d 700, 706

(9th Cir. 2004)).

However, Ninth Circuit case law distinguishes between "infringement" claims and "ownership" claims. Unlike infringement claims, "ownership claims accrue only once, at the time 'when plain and express repudiation of co-ownership is communicated to the claimant, and are barred three years from the time of repudiation,' because 'an infringement occurs every time the copyrighted work is published, but creation does not.'" *Pak's Trading Eur. B.V. v. Target*, No. SA CV 18-0536-DOC (DFMx), 2018 WL 8333362, at *5 (C.D. Cal. July 5, 2018) (quoting *Zuill v. Shanahan*, 80 F.3d 1366, 1369, 1371 (9th Cir. 1996)). "[A]n untimely ownership claim will bar a claim for copyright infringement where the gravamen of the dispute is ownership, at least where . . . the parties are in a close relationship." *Seven Arts Filmed Ent. Ltd. v. Content Media Corp. PLC*, 733 F.3d 1251, 1258 (9th Cir. 2013).

In *Seven Arts*, the Ninth Circuit affirmed the district court's dismissal of a case brought by plaintiff Seven Arts Filmed Entertainment against Paramount, a film studio, alleging that Paramount had improperly failed to pay royalties to the rightful owner of three films distributed by Paramount. 733 F.3d at 1252. Seven Arts claimed that it, not another entity, was the copyright holder of the films. As the Ninth Circuit explained, "[i]n the ordinary infringement case, ownership is not in dispute; rather, the dispute centers on the second prong—whether, for example, the copying was a fair use, or whether the materials taken were original." *Id.* at 1254 (cleaned up). But the *Seven Arts* dispute was "about ownership—Paramount concede[d] it [was] exploiting the pictures, but denie[d] that Seven Arts owns the copyrights. *Id.*⁷ Here, as in *Seven Arts*, Miramax

---

⁷ Zahedi dismisses *Seven Arts* as a case "involving 'putative co-owner[s].'" (DMSJ Opp'n 13.) Zahedi is wrong: *Seven Arts* did not involve putative co-owners. Moreover, *Seven Arts* expressly rejected the plaintiff's attempt to limit the express repudiation rule to co-ownership claims. *See id.* at 1255 (describing plaintiff's ownership versus co-ownership argument as "a distinction without a difference"). Zahedi's insistence throughout his briefs that he does not claim co-ownership of the photograph is irrelevant to the rule established in *Seven Arts*.

concedes it is exploiting the photograph, but it denies that Zahedi owns the copyright. The gravamen of this case—at least during this "ownership" phase—is ownership.

Where the gravamen of a claim is ownership, the statute of limitations will bar a claim if (1) the parties are in a close relationship and (2) there has been an "express repudiation" of the plaintiff's ownership claim. *See id*. at 1254, 1256. Zahedi argues first that he is not in a "close relationship" with Miramax, (DMSJ Opp'n 13–14), and second that Miramax did not clearly and expressly repudiate his ownership, (*id.* at 14–18.)

### 1. Close Relationship

Zahedi argues he does not have a "close relationship" with Miramax, LLC. In *Seven Arts*, the Ninth Circuit noted that enforcement of the express repudiation rule against parties who are not in a close relationship "could introduce uncertainty into the enforcement of copyrights and require copyright holders to file suit against any third party that might be deemed to have repudiated the copyright owner's title." 733 F.3d at 1256.

Zahedi attempts to distinguish this case from cases cited by Miramax. (DMSJ Opp'n 13–14.) He notes that in other cases in which courts have found a "close relationship," the parties had entered into contracts or express agreements regarding the work in question. (*See id*. at 14 (distinguishing *White v. Warner-Tamerlane Publ'g Corp.*, No. CV 16-5831-PSG (JEMx), 2017 WL 4685542 (C.D. Cal. May 22, 2017), *aff'd sub nom. White v. Broadus*, 748 F. App'x 131 (9th Cir. 2019), by explaining that in that case the parties had a "prior business relationship and express agreement for [the] work at issue").) But that is exactly the situation here. There is no dispute that even if Zahedi owns the copyright in his photograph, he took the photograph at Miramax Film Corp.'s request and granted Miramax Film Corp. at least a limited license to use it for certain purposes. Zahedi had a prior business relationship and at least a verbal agreement with Miramax Film Corp. regarding his photograph.

///

Zahedi also argues that he was not in contractual privity with Miramax, LLC; rather, his agreement was with Miramax, LLC's predecessor, Miramax Film Corp. (*See* PMSJ Reply 18.) As discussed above, this distinction is critical with regard to Miramax's infringement claim against Zahedi. This distinction is not determinative, however, with regard to whether Zahedi and Miramax had a close relationship. In *Seven Arts*, the Ninth Circuit found that where the plaintiff's predecessor-in-interest had contracted with the defendant regarding distribution rights for the films in question, the parties were in a close relationship. 733 F.3d at 1256–57. The situation is reversed here: Zahedi contracted with Miramax's predecessor-in-interest. In *Seven Arts*, however, the court made clear that the "close relationship" limitation was intended to prevent copyright holders from needing to assert their rights against any potential third-party repudiations. The court emphasized that Seven Arts *knew* about Paramount's interest in, and exploitation of, the rights in question. *Id*. at 1257. Zahedi does not assert that he did not realize Miramax, LLC was the successor to Miramax Film Corp. Indeed, he says he knew Miramax, LLC was exploiting the photograph. (*See* Zahedi Dep. 237:12–16, ECF No. 145-3 (in 2015, Zahedi "thought [the action figure] was at that point just something the film company had put out").) Based on the definition established by binding Ninth Circuit authority, Zahedi and Miramax were in a close relationship.[8]

### 2. Repudiation

Zahedi argues that Miramax did not plainly and expressly repudiate Zahedi's copyright ownership. (*See* DMSJ Opp'n 14–18; PSMJ Reply 18–21.) Miramax does not assert, for example, that it repudiated Zahedi's copyright through a letter or other direct communication claiming ownership. *Cf. Seven Arts*, 733 F.3d at 1257 (recounting three letters from defendant to plaintiff repudiating ownership). Rather, Miramax cites cases

---

[8] The only other case cited by Zahedi is inapposite. In *Pak's Trading Europe B.V. v. Target*, the parties apparently had no relationship other that selling products in the same channels of commerce before the initiation of proceedings regarding copyright ownership. *See* 2018 WL 8333362, at *1–2.

13

showing that copyright registration, failure to provide credit, and failure to pay royalties can show plain and express repudiation. *See Aalmuhammed v. Lee*, 202 F.3d 1227, 1231 (9th Cir. 2000) (movie credits "plainly and expressly repudiated authorship" by listing the plaintiff "far below the more prominent names"), *Saenger Org., Inc., v. Nationwide Ins. Licensing Assocs., Inc.*, 119 F.3d 55, 66 (1st Cir. 1997) (copyright registration constituted constructive notice of a claim of exclusive copyright ownership), *Santa-Rosa v. Combo Recs.*, 471 F.3d 224, 228 (1st Cir. 2006) (applying Ninth Circuit test to find that openly and notoriously selling records without paying royalties constituted plain and express repudiation of coownership); *see also Straughter v. Concord Music*, No. ED CV 19-1360-JFW (SHKx), 2020 WL 6821313, at *4–5 (C.D. Cal. Oct. 13, 2020) (finding clear and express repudiation where a party obtained a copyright registration and a mechanical license for music royalties). The purported repudiation should be an act that is adverse to the party whose ownership is being repudiated. *See Everly v. Everly*, 958 F.3d 442, 453 (6th Cir. 2020) (citing *Brownstein v. Lindsay*, 742 F.3d 55, 72 (3d Cir. 2014));[9] *Gaiman v. McFarlane*, 360 F.3d 644, 654 (7th Cir. 2004).

Zahedi raises three arguments. First, Zahedi argues that Miramax's copyright registration for the poster does not constitute an express repudiation of Zahedi's ownership because it does not assert ownership of a photograph, but rather of a "2 Dimensional artwork." (DMSJ Opp'n 14–15.) Second, Zahedi asserts that Miramax did not expressly repudiate Zahedi's ownership by using its own copyright mark on items featuring the poster because Miramax credited Zahedi as the copyright holder of the photograph on the cover of the 1994 publication of the script. (*Id.* at 15–17.) Third, Zahedi contends that Miramax's failure to pay him royalties for its use of the photograph does not constitute an express repudiation of his ownership. (*Id.* at 17–18.)

---

[9] Zahedi cites *Everly* for the proposition that a third party's actions cannot constitute an act of repudiation. The *Everly* court reasoned to the contrary, however: "the actions of third parties and the plaintiff may serve as circumstantial evidence of repudiation by a putative co-author or co-owner." 958 F.3d at 454 n.10.

14

Zahedi argues that Miramax's copyright registration did not cover his photograph, and that the registration therefore did not serve as an express repudiation of his ownership of the photograph. His photograph and the poster are different: the photograph used on the poster is slightly altered from the original, and the poster also includes lettering and an "aging" effect to make it look like the tattered cover of a paperback. Miramax did not check the "photograph" box on the copyright registration. Zahedi is correct that Miramax's copyright registration does not provide constructive notice of Miramax's claim of exclusive copyright ownership because Miramax's copyright registration could plausibly be understood to cover only the poster, and not the underlying photograph. Moreover, although a First Circuit panel in *Saenger* found that registration of a copyright constitutes plain and express repudiation, other courts have disagreed with this conclusion. *See, e.g.*, *Gaiman*, 360 F.3d at 655 (questioning the idea that copyright registration provides constructive notice of an ownership claim and noting the plaintiff in *Saenger* also had actual notice of an adverse claim of ownership).

The Court is skeptical of the notion that mere registration of copyright, or even registration of copyright plus Miramax's assertion of its copyright on items using the photograph, rises to the level of express repudiation, especially since the copyright registration does not clearly claim ownership of Zahedi's photograph. But the Court need not decide whether Zahedi had constructive notice of Miramax's repudiation because he had *actual* notice. Where, as here, Zahedi actually knew that Miramax was exploiting a photograph of which he claimed ownership without giving him credit or royalties, his failure to bring suit to assert his ownership rights is fatal to his case. *See, e.g.*, *Gaiman*, 360 F.3d at 654 (reasoning that a copyright notice only affects the accrual of an ownership cause of action if the victim actually reads it); *see also Scorpio Music (Black Scorpio) S.A. v. Willis*, No. 11cv1557 BTM(RBB), 2013 WL 790940, at *6 (S.D. Cal. Mar. 4, 2013) (expressing skepticism that registration and failure to credit rise to the level of plain and express repudiation and reasoning that "Plaintiffs should have to

show that [the defendant] had actual notice of the content of the registrations and the record labels"); *cf. White*, 2017 WL 4685542, at *3 (granting motion to dismiss ownership claim when the parties had a preexisting business relationship and an agreement regarding the music track at issue, plaintiffs were aware of defendants' use of the track years earlier, and defendants repudiated plaintiffs' rights by registering their copyright in the track, emphasizing plaintiffs' knowledge of defendants' use).

Zahedi's receipt in 2015 of an action figure prominently featuring the iconic photo, bearing Miramax's copyright notice, and failing to credit Zahedi is uncontroverted evidence of his actual knowledge of Miramax's plain and express repudiation of his ownership. There is no genuine dispute that Zahedi understood it as such. While it may be true that Miramax changed its position on its copyright claim over the decades since 1994—Zahedi is correct that Miramax credited Zahedi as the owner of the photograph on the cover of its 1994 script, and the record does not clarify at what point Miramax stopped crediting Zahedi—it is clear that Zahedi understood in 2015 that Miramax claimed more rights in the photograph than Zahedi believed it had.

As Miramax points out, this case implicates several of the policy justifications for imposing a statute of limitations. Miramax's original concept sketches have been lost. There is a factual dispute regarding the existence of a written work-for-hire agreement. The witnesses' memories, and Miramax's institutional memory, have faded. Zahedi's claim against Miramax is barred by the statute of limitations. For this reason, the Court grants Miramax's motion, declines to address Miramax's other arguments for dismissal of Zahedi's claims, and denies Zahedi's motion.

///

## V. CONCLUSION

The Court grants Miramax's motion and denies Zahedi's motion. Zahedi's claims against Miramax are dismissed with prejudice.

**IT IS SO ORDERED.**

Dated: August 19, 2022

MARK C. SCARSI
UNITED STATES DISTRICT JUDGE